UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARNELL HUTCHINSON,      :    1:11-CV-00320
                  :
       Plaintiff      :
                  :    (Magistrate Judge Schwab)
      v.           :
                  :
SHIRLEY MOORE SMEAL, *et al.,*  :
                  :
     Defendants     :

## MEMORANDUM

## I. Introduction.

The plaintiff, Darnell Hutchinson, claims that the defendants denied him due process and equal protection under the law and that they conspired and retaliated against him. Hutchinson's claims arise from his assignment to a Batterer's Intervention program in prison. For the reasons discussed below, we will grant the defendants' motion for summary judgment.

## II. Background and Procedural History.

In February of 2011, Hutchinson, proceeding *pro se* and *in forma pauperis,* began this 42 U.S.C. § 1983 action by filing a complaint. In July of 2011, he filed an amended complaint naming the following individuals as defendants: Shirley Moore Smeal, the former Acting Secretary of the Pennsylvania Department of

Corrections (DOC); Dorina Varner, the Chief Grievance Officer of the DOC; B. Corbin, the former Acting Superintendent of the State Correctional Institution at Huntingdon (SCI-Huntingdon); Connie Green, the Grievance Coordinator at SCI-Huntingdon; H. Wiedel and P. Lechner, unit managers at SCI-Huntingdon; C. Cook and C. Conrad, correctional counselors at SCI-Huntingdon; Brittney Johnson, a clerk/typist at SCI-Huntingdon; and Sean P. Clapper, a sergeant at SCI-Huntingdon.

Hutchinson alleges that, on October 1, 2010, defendants Wiedel and Cook interviewed him for prerelease, outside module housing, and parole, and Cook falsely accused him of having a rape conviction. According to Hutchinson, Cook also fabricated a report which stated that a presentence investigation report indicated that Hutchinson's ex-wife had alleged that he physically and mentally abused her, and Cook recommended that Hutchinson participate in a Batterer's Group. Hutchinson accused Cook of lying and retaliating against him for filing grievances against him. Defendant Wiedel then said that she did not have time to check the information at that time and that she would continue the interview until October 4, 2010.

After leaving Wiedel's office, Hutchinson stopped at the sergeant's desk and asked for a grievance form. He then returned to his cell, and, according to

Hutchinson, defendant Clapper then called Wiedel and Cook and told them that Hutchinson was filing a grievance against them. Hutchinson alleges that, a few minutes later, he was called back to Wiedel's office and questioned about why he was filing a grievance. Wiedel told Hutchinson that she had checked with the records office and that she had been told that he did not have a rape conviction. Hutchinson alleges that he told Wiedel that he still intended to file a grievance against Cook because Cook was retaliating against him for prior grievances that he had filed.

According to Hutchinson, Wiedel then started questioning him about a 1972 conviction for assault, asking him whether he had assaulted his girlfriend. Hutchinson alleges that he told Wiedel to check the records herself. Then, according to Hutchinson, Wiedel insulted and belittled him by saying: "You look much older than fifty-six years old, and you won't get out of jail until you are about eighty years old." Hutchinson responded by saying this is retaliatory "Bull-Sh" just to stop me from getting prerelease and making parole. Hutchinson left the office and returned to his cell.

Minutes later, according to Hutchinson, defendant Clapper came to his cell and told him to pack because he is going to the Restricted Housing Unit. Hutchinson was taken to the Restricted Housing Unit and was given a misconduct

report charging him with using abusive language, disobeying an order, and threatening a staff member. The basis for one of the misconduct charges was that Hutchinson had said that he is "no fucking child." After previously stating that she had not heard Hutchinson make such a statement, defendant Johnson testified during the disciplinary hearing that she had, in fact, heard him make that statement. Hutchinson received sixty days of disciplinary custody time.

Hutchinson alleges that he filed several grievances regarding defendants Cook, Wiedel, and Clapper. According to Hutchinson, defendant Green refused to file those grievances. Hutchinson also filed a grievance about being placed in the Batterer's Group, and Green allegedly refused to file that grievance as well. Hutchinson sent a copy of that grievance to defendant Smeal, and he inquired about why his grievances were not being filed. Soon thereafter, the grievance concerning the Batterer's Group was filed and sent to defendant Lechner for an investigation and response.

Defendant Lechner investigated and answered the grievance. He asserted that Hutchinson had admitted having assault charges with regard to his ex-wife. Defendant Lechner did not explain to whom Hutchinson had allegedly admitted such charges. None of the other reports mention anything about Hutchinson having assault charges or convictions concerning his ex-wife.

According to Hutchinson, defendant Conrad assessed him as having to participate in the Batterer's Group even though he had not been charged with or convicted of spousal abuse. Hutchinson asked Conrad to look at his criminal records or to call the institution's record office to check the truthfulness of what defendants Cook and Wiedel had written in connection with their recommendation that he participate in the Batterer's Group. Defendant Conrad responded that their word was good enough.

Hutchinson appealed the denial of his grievance to defendant Corbin, who responded that Hutchinson had self admitted and that the Batterer's Group would be added to his correctional plan. Hutchinson unsuccessfully appealed the denial of his grievances to defendants Smeal and Varner. But, in response to a letter to defendant Smeal, Hutchinson's disciplinary custody time was reduced to 30 days and he was placed on another block away from defendants Cook and Wiedel. Nothing, however, was done about restoring his "R" Code level and outside work detail.

Because participation in the Batterer's Group was added to his correctional plan, according to Hutchinson, he was required to participate in the Batterer's Group therapy sessions in order to be eligible for a favorable recommendation from the DOC for any advancement or parole.

The amended complaint contains four counts. Count One is claim of denial of access to the courts. Count Two is a due process claim against defendants Smeal, Varner, Corbin, Green, Wiedel, Lechner, Cook, and Conrad based on Hutchinson not being provided notice and a hearing prior to being assigned to the Batterer's Group. Count three is an *ex post facto* claim based on Hutchinson's assignment to the Batterer's Group. Count Four is a claim against defendants Cook, Wiedel, Clapper, and Johnson for retaliation for Hutchinson's assertion that he intends to file a grievance against defendant Cook. In connection with Count Four, Hutchinson claims that these defendants conspired to have him confined in the Restricted Housing Unit to prevent him from filing the grievance and also that their actions were racially motivated because he is a person of color and they objected to him filing a grievance against a co-worker.

In his complaint, Hutchinson sought declaratory and injunctive relief as well as compensatory and punitive damages. Because Hutchinson has been paroled, *see doc. 78* at 4, his claims for declaratory and injunctive relief are now moot, *see doc. 70* at ¶4 and *doc. 79* at ¶4.

In May of 2012, Judge Jones granted in part and denied in part the defendants' motion to dismiss the amended complaint. He dismissed the claims for monetary damages against the defendants in their official capacities, the access-to-the-courts

claim, and the *ex post facto* claim.  He denied the motion in all other respects. Thus, the remaining claims are the due process, retaliation, equal protection, and conspiracy claims.

After the motion to dismiss was decided, counsel was appointed to represent Hutchinson.  In January of 2013, by a joint stipulation, defendant Johnson was dismissed from the case with prejudice.  Thereafter, the parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to me to conduct all proceedings and order the entry of a final judgment.

Currently pending is the defendants' motion for summary judgment, which, for the reasons discussed below, will be granted.


## III. Discussion.

### A.  Summary Judgment Standard.

The defendants have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury

trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether

there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## B. The Material Facts.

A party who seeks to resist a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Under this Rule, the failure to follow these instructions and appropriately challenge the material facts tendered by the defendants means that those facts must be deemed admitted.

Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.*

The defendants filed a statement of material facts, and Hutchinson filed a response. While Hutchinson states that he disputes a number of the facts set

forth by the defendants, in many cases he does not cite to record evidence to support such a dispute. For example, many times he responds to a fact set forth by the defendants by stating that he "is without sufficient knowledge or information to form a belief" and therefore he denies the fact without citing any record evidence to contradict the statement of the defendants. *See e.g., Doc. 80* at ¶¶13-21, 45-46, 51-52, & 69. Many times he also responds to statements set forth by the defendants by stating that the statemtents "are opinion and not statement[s] of fact and therefore no response is required. Should a response be deemed required, said averments are denied." *See e.g., Doc. 80* at ¶¶44-49 & 53. Such conclusory denials without evidentiary support do not create genuine factual disputes. Accordingly, we consider those facts to be undisputed for purposes of the defendants' summary judgment motion. Based on the statement of material facts filed by the defendants and Hutchinson's response, the following facts are either undisputed or, where Hutchinson has presented evidence, Hutchinson's version of the facts.

On October 1, 2010, defendant Cook, along with defendant Weidel, interviewed Hutchinson for possible parole release. *Doc. 73 (Defendants' Statement of Material Facts)* at ¶4 and *Doc. 80 (Hutchinson's Response to Defendants' Statement of Material Facts)* at ¶4. Cook, a sixteen-year employee of the DOC,

12

was at the time a Correctional Counselor 2 at SCI-Huntingdon, and he was responsible for counseling-related services for inmates under his charge, including Hutchinson. *Id*. at ¶¶5-6.    Cook's duties involved reviewing inmate's programing in preparation for consideration for parole. *Id*. at ¶7.    The October 1st meeting occurred in the office of Weidel, who was the Unit Manager on Hutchinson's block. *Id*. at ¶8.    At the meeting, Cook presented a report that stated that Hutchinson had done time for rape under his previous inmate number. *Id*. at ¶9.    After Hutchinson disputed that statement, Weidel stated that she would postpone the interview until Monday, October 4, 2010, and she would check with the records office to see if Hutchinson had, in fact, been convicted of rape. *Id*. at ¶¶10-11.

Hutchinson was then taken back to his cell, and Weidel immediately contacted the institution's records office and was advised that Hutchinson did not have a rape conviction. *Id*. at ¶¶12-13.    Cook's basis for believing that Hutchinson had a prior rape conviction was a notation appearing in the official paperwork furnished by the Clerk of Courts in Philadelphia that contained a notation next to the rape charge stating "DEMURRER SUST." *Id*. at ¶14.    He incorrectly interpreted this to mean that the rape charge had been sustained and the case dismissed.[1] *Id*. at ¶15.

---

[1] Cook was later advised by counsel, after this litigation had been filed, that the notation, in fact, meant that some type of preliminary motion had been sustained and

13

Immediately after speaking with the records office, Weidel telephoned defendant Clapper in an effort to locate Hutchinson. *Id*. at ¶19. At that time, Clapper told Weidel that Hutchinson had asked him for a grievance form and was filing a grievance against her and Cook. *Id*. at ¶20. It is usual procedure for Clapper to notify the subject of a grievance of the attempt to file the grievance so that the subject of the proposed grievance can identify the source of the problem and direct the inmate to the appropriate person for assistance, if needed. *Id*. at ¶21. Clapper then escorted Hutchinson back to Weidel's office. *Id*. at ¶22.

Weidel then informed Hutchinson that he was correct that he did not have a rape conviction on his record. *Id*. at ¶23. Weidel then asked Hutchinson why he was filing a grievance given that she and Cook had requested that he wait until Monday, October 4, 2010, so that she could find out the status of his criminal history and, hopefully, resolve the matter. *Id*. at ¶24. Hutchinson's file also contained a pre-sentence investigation report indicating that his deceased ex-wife had reported that he had been physically abusive to her. *Id*. at ¶ 25. When questioned about this in the October 1, 2010 meeting, Hutchinson denied that he had been physically abusive to his ex-wife, but, according to Weidel and Cook, he made statements

---

the rape charge had been dismissed. *Id*. at ¶16 Counsel directed Cook to note on the original paperwork what the notation meant, and he did so. *Id*. at ¶17.

indicating that he had been verbally and mentally abusive to her. *Id*. at ¶26. Hutchinson asserts, however, that he never admitted to the defendants that he had mentally or physically abused anyone. *Doc. 81 (Hutchinson's Decl. at ¶10)* at 3.

Hutchinson's file also contained information that he had been convicted of simple assault in 1972. *Doc. 73 (Defendants' Statement of Material Facts)* at ¶27 and *Doc. 80 (Hutchinson's Response to Defendants' Statement of Material Facts)* at ¶27. When questioned about this at the October 1, 2010 meeting, Hutchinson admitted that he had been convicted of simple assault. *Id*. at ¶28. According to Weidel and Cook, Hutchison stated that the assault was against his then girlfriend. *Doc. 73 (Defendants' Statement of Material Facts)* at ¶28. Hutchinson asserts, however, that he was convicted of simple assault against a woman that he barely knew. *Doc. 81 (Hutchinson's Decl. at ¶3)* at 2. During the interview, Weidel told Hutchinson that he looked older than he was, and Cook recommended that Hutchinson take Batterer Intervention (BI) programming. *Doc. 73 (Defendants' Statement of Material Facts)* at ¶¶30-31 and *Doc .80 (Hutchinson's Response to Defendants' Statement of Material Facts)* at ¶¶30-31. Hutchinson responded to the recommendation for BI by claiming that the actions of Cook and Weidel were "retaliatory bullshit" to stop him from obtaining pre-release or parole and asserting that he was "not a fucking child." *Id*. at ¶33. Hutchinson then tried to leave

Weidel's office. *Id*. at ¶34.   Cook directed Hutchinson to return to Weidel's office, but Hutchinson initially refused to do so. *Id*. at ¶35.   Weidel then issued Hutchinson a misconduct for using abusive language, disobeying an order, and threatening a staff member.[2]  *Id*. at ¶37.   Hutchinson later admitted that he had used abusive language. *Id*.   After a few minutes of trying to de-escalate the situation, Clapper took Hutchinson to the Restricted Housing Unit because of the misconduct. *Id*. at ¶38.

Cook was an instructor for BI, and he understood to what behaviors it was targeted. *Id*. at ¶40.   According to the defendants, BI is directed not only toward inmates who engage in physical violence, but also to those who engage in gender-based intimidation. *Id*. at ¶41.   Domestic violence, which BI is meant to address, actually describes a very broad pattern of behavior that is directed toward an intimate partner with the goal of power and control over the victim. *Id*. at ¶¶44-45.   According to the defendants, this goes well beyond the construct of physical violence. *Id*. at ¶46. Rather, physical violence, and the threat of physical violence, is just a means of enforcement. *Id*. at ¶47.   The defendants assert that physical harm is not the goal; power and control are the goals. *Id*. at ¶ 48.   In order to be an appropriate candidate for

---

2 The hearing examiner later dismissed the charge of threatening a staff member. *See Doc. 72-2* at 7.

BI, a person need not necessarily have engaged in any criminal actions, although he or she may have. *Id.* at ¶50. Someone who strikes (*i.e.*, criminally batters) his or her spouse would be an appropriate candidate for BI even if charges were never brought for such action. *Id.* at ¶ 51. According to the defendants, BI would also be appropriate for someone who verbally or mentally abuses or attempts to intimidate or inappropriately control an intimate partner, conduct that does not constitute a crime at all. *Id.* at ¶52. Hutchinson's records show that since being in prison, he has exhibited a pattern of intimidating and controlling female, but not male, staff. *Id.* at ¶53. Those records show that Hutchinson has denied any history of violence of any kind, despite his robbery convictions. *Id.* at ¶55.

Although he initially refused to participate in the BI, after he realized that he would not be paroled otherwise, Hutchinson eventually took and successfully completed the BI. *Id.* at ¶65 & *Doc. 81 (Hutchinson's Decl. at ¶19)* at 3. There is nothing in Hutchinson's files, such as a grievance, to indicate that because he was identified as needing BI and enrolled in BI, he was the subject of any stigmatization, repercussions, verbal abuse, or any other action by any inmate or Department staff member. *Doc. 73 (Defendants' Statement of Material Facts)* at ¶66 and *Doc. 80 (Hutchinson's Response to Defendants' Statement of Material Facts)* at ¶66. But, according to Hutchinson, once he was enrolled in BI, he was ostracized by other

inmates, who refused to be friends with him. *Doc. 81 (Hutchinson's Decl. at*
*¶¶20-21)* at 3-4. Also, some inmates threatened him by saying that they would beat
the "wife-beater." *Id.* According to Hutchinson, he became fearful for his safety,
and he began to withdraw from activities: he stopped going to the yard, instead
staying in his cell, and he stopped going to the chow hall, instead buying food at the
commissary. *Id.* at ¶22-24. Hutchinson also asserts that when he tried to get a job at
the prison law library, the librarian told him that he could not work there as he was a
wife-beater. *Id.* at ¶25. According to Hutchinson, in BI, the instructors explore an
inmate's sexual history and ask a lot of sexual and personal questions. *Id.* at ¶26.
Further, he asserts that they make an inmate change his answers to questions. *Id.* at
¶27. For example, according to Hutchinson, if an inmate says that he never abused
a woman they will refuse to pass the inmate until he says that he did abuse women.
*Id.*

According to Regional Deputy Secretary Michael D. Klopotoski, a
twenty-nine year DOC veteran, inmate batterers, unlike sex offenders, are not
considered abhorrent in the inmate subculture, nor are they subject to being beaten
by other inmates or being targeted for sexual violence due to their status as batterers.
*Doc. 73 (Defendants' Statement of Material Facts)* at ¶68 and *Doc. 80*
*(Hutchinson's Response to Defendants' Statement of Material Facts)* at ¶68.

18

Inmates in BI are not viewed by the Department as inmates who may be in need of special protection from other inmates merely because of being recommended for or participating in BI. *Id.* at ¶69.

### C. The Defendants Are Entitled to Summary Judgment on the Due Process Claim.

Hutchinson claims that defendants Smeal, Varner, Corbin, Green, Wiedel, Lechner, Cook, and Conrad denied him due process because he was assigned to BI without notice or a hearing. Before we address the merits of that claim, we address the argument of defendants Smeal, Varner, Corbin, Green, Lechner, and Conrad that they are entitled to summary judgment because Hutchinson has not established personal involvement on their part.

Liability under § 1983 "'cannot be predicated solely on the operation of respondeat superior.'" *Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1998)). Thus, a constitutional deprivation cannot be premised merely on the fact that the defendant was a supervisor when the incidents set forth in the complaint occurred. *See Alexander v. Forr*, 297 F. App'x 102, 104-05 (3d Cir. 2008). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must [establish] that each Government-official defendant, through the official's own individual actions, has

violated the Constitution." " *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). There are two viable theories of supervisory liability. *Santiago v. Warminster Twp.*, 129 F.3d, 121, 129 n.5 (3d Cir. 2010). Under the first theory, a supervisor can be liable if he or she established and maintained a policy, practice, or custom that directly caused the constitutional harm. *Id.* Under the second theory, a supervisor can be liable if he or she participated in violating the plaintiff's rights, directed others to violate the plaintiff's rights, or as the person in charge had knowledge of and acquiesced in his or her subordinates' violations of the plaintiff's rights. *Id.*

Hutchinson has not addressed the argument of defendants Smeal, Varner, Corbin, Green, Lechner, and Conrad that they were not personally involved in the alleged denial of due process with respect to his assignment to BI. Thus, we conclude that he agrees that these defendants were not personally involved. In any event, he has not pointed to record evidence of their personal involvement. Accordingly, defendants Smeal, Varner, Corbin, Green, Lechner, and Conrad are entitled to summary judgment on the due process claim.

That leaves Wiedel and Cook as defendants as to the due process claim. We conclude that they too are entitled to summary judgment on the due process claim.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." A due process claim requires a two-part analysis. First, the court must determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). Second, if the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it." *Id.*

Neither life nor property were at stake with respect to Hutchinson's assignment to BI. Thus, Hutchinson has a viable due process claim only if he had a liberty interest protected by the Due Process Clause with regard to his assignment to BI. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word "liberty," or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)(citations omitted). Thus, "[a] prisoner may be deprived of a liberty interest in violation of the Constitution in two ways: (1) when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing, and (2) when state statutes and regulations create a liberty interest in freedom from restraint that imposes an 'atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life,' thereby triggering due process protection."

*Renchenski v. Williams,* 622 F.3d 315, 325 (3d Cir. 2010)(citations omitted).

"The first is the so-called independent due process liberty interest, while the latter

is the so-called state-created liberty interest." *Id.*

Hutchinson is not clear about whether he is contending that he had a

state-created liberty interest or an independent liberty interest protected by the Due

Process Clause itself. But because he does not couch his argument in terms of a

state-created liberty interest, i.e., he does not argue that assignment to BI imposed an

"atypical and significant hardship" on him, we conclude that he is contending that he

had an independent liberty interest protected by the Due Process Clause itself.

With respect to such liberty interests under the Due Process Clause itself, "as long as

the conditions or degree of confinement to which the prisoner is subjected is within

the sentence imposed upon him and is not otherwise violative of the Constitution,

the Due Process Clause does not in itself subject an inmate's treatment by prison

authorities to judicial oversight." *Asquith v. Dep't of Corr.,* 186 F.3d 407, 410 (3d

Cir.1999)(quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983). "[C]hanges in the

conditions of confinement having a substantial adverse impact on the prisoner are

not alone sufficient to invoke the protections of the Due Process Clause '[a]s long as

the conditions or degree of confinement to which the prisoner is subjected is within

the sentence imposed upon him.'" *Vitek v. Jones*, 445 U.S. 480, 493 (1980)(quoting

*Montanye v. Haymes*, 427 U.S. 236, 242 (1976)). On the other hand, consequences

that are "qualitatively different" from those usually imposed on a person convicted

of a crime can lead to the finding of a protected liberty interest. *Id.* "[S]evere

changes in conditions of confinement amount[ing] to a grievous loss" are required.

*Renchenski,* 622 F.3d at 325. "Severe changes in conditions of confinement

include, for example, forced administration of antipsychotic medication,

*Washington v. Harper*, 494 U.S. 210, 221–222, 110 S.Ct. 1028, 108 L.Ed.2d 178

(1990), or involuntary transfer to a mental hospital, *Vitek v. Jones*, 445 U.S. 480,

492, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), or, for a prisoner not convicted of a sex

offense, forced participation in sex-offender therapy, *Renchenski*, 622 F.3d at 326."

*Evans v. Sec'y Pennsylvania Dep't of Corr.,* 645 F.3d 650, 665 (3d Cir. 2011).

   In *Renchenski,* the Third Circuit held that an inmate who has never been

charged with, nor convicted of, a sex offense is entitled to due process before being

classified as a sex offender and required to undergo sex offender treatment. *Id.* at

331. The defendants attempt to distinguish *Renchenski,* and they argue that being

labeled a batterer and recommended for BI is distinguishable from the circumstances

in *Renchenski* where the prisoner was labeled a sex offender and assigned to sex

offender treatment. Hutchinson contends that the stigma attached to him does not

have to rise to the level of the stigma attached to a sex offender in order for due process to be required. While we agree that in order for due process to apply, the level of stigma does not necessarily have to be as severe as the stigma attached to the sex offender label. Nonetheless, we conclude that *Renchenski* is the most analogous case. Thus, we set forth its reasoning and holding in some detail.

In *Renchenski*, the Third Circuit recognized that "prisons have a strong interest in enrolling their inmates in various rehabilitative programs and that prison administrators are in the best position to exercise discretion in administering those programs." 622 F.3d at 331. Nevertheless, the court accepted Renchenski's argument that the stigmatizing consequences of being labeled a sex offender, coupled with mandated behavioral modification therapy, constitute the kind of deprivation of liberty that requires procedural protections. *Id.* at 325. The court reasoned:

> In evaluating Renchenski's argument, we are guided by the Supreme Court's decision in *Vitek,* in which the Court held that the "involuntary transfer of a ... state prisoner [convicted of robbery] to a mental hospital implicate[d] a liberty interest that is protected by the Due Process Clause." 445 U.S. at 487, 100 S.Ct. 1254. While the Court based this holding, in part, on a state-created liberty interest, it also held that the prisoner's liberty interest existed separate and apart from the state regulation. Specifically, the Court noted that the stigmatizing characterization of the prisoner as mentally ill, when coupled with the transfer to an asylum to participate in mandatory

behavioral therapy, "constituted a major change in the conditions of confinement amounting to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing." *Id.* at 488, 100 S.Ct. 1254 (quotation marks omitted); *compare Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding that a prisoner had an independent liberty interest in being free from the arbitrary administration of psychotropic drugs), *with Meachum,* 427 U.S. at 224, 96 S.Ct. 2532 (holding that the Due Process Clause does not independently create a liberty interest in prisoners to be free from intrastate prison transfers). The Court reasoned that despite the prisoner's conviction for robbery, he still "retained a residuum of liberty that would be infringed ... without complying with minimum requirements of due process." *Vitek,* 445 U.S. at 491, 100 S.Ct. 1254. In turn, the Court concluded that transfer to a mental institution was "'qualitatively different' from the punishment characteristically suffered by a person convicted of crime, and had 'stigmatizing consequences.'" *Sandin,* 515 U.S. at 479 n. 4, 115 S.Ct. 2293 (citing *Vitek,* 445 U.S. at 493–94, 100 S.Ct. 1254) (quotation marks omitted). Thus, when determining an inmate's due process right "to be free from ... unjustified intrusions on personal security[,]" *Vitek* instructs courts to consider "[c]ompelled treatment in the form of mandatory behavior modification programs[.]" 445 U.S. at 492, 100 S.Ct. 1254.

Relying on *Vitek,* Renchenski argues that the District Court erred in not recognizing that the Due Process Clause independently conferred upon him a liberty interest in not being classified as a sex offender—which he argues is even more stigmatizing than being labeled as mentally ill—and forced into sex offender treatment without due process. We agree that only after a prisoner has been afforded due process may sex offender conditions be imposed on an inmate who has not been convicted of a sexual offense.

It is largely without question—and Defendants do not claim otherwise—that the sex offender label severely stigmatizes an individual, and that a prisoner labeled as a sex offender faces

unique challenges in the prison environment. Renchenski cites to numerous sociological and criminal justice studies which conclude that sex offenders are considered "an anathema in the inmate subculture ... [and] inmate norms call for their savage beating." Appellant's Br. at 9 (citing James E. Robertson, Sex Offenders and the Criminal Justice System 83–87 (1994)). Sexual offender inmates are also ready targets for sexual violence in prison. Indeed, studies suggest that sexual offenders' rate of sexual abuse in prison ranges from 34% to 50% higher than that of the general prison population. . . . Accordingly, we agree with Renchenski that classifying him as a moderate/high risk sex offender—or even as a possible sex offender—is stigmatizing.

We also believe that the SOTP [sex offender treatment program] seven-step program, which consists of weekly psychotherapy sessions for approximately two years, is sufficiently similar to the forced transfer to a mental institution that the Supreme Court determined triggered a liberty interest in *Vitek*. Just as the Supreme Court reasoned that being confined to a mental institution was not within the sentence imposed on the prisoner in *Vitek,* who was incarcerated and being punished for robbery, mandating Renchenski's participation in SOTP is not within the sentence imposed since he is incarcerated for committing murder in the first degree and not for committing a sexual offense. In other words, because Renchenski was convicted of murder and his punishment is predicated upon that conviction, sex offender treatment is not one of the conditions of confinement that his sentence imposes upon him. In turn, compelled treatment, i.e., sex offender therapy, changes the conditions of Renchenski's sentence and, accordingly, constitutes a loss of liberty that exceeds his loss of freedom from confinement. *See Vitek,* 445 U.S. at 492, 100 S.Ct. 1254.

*Renchenski*, 622 F.3d at 325-27 (footnote omitted). Accordingly, the Third Circuit

held that "the stigmatizing effects of being labeled a sex offender, when coupled

with mandatory behavioral modification therapy, triggers an independent liberty interest emanating from the Due Process Clause of the Fourteenth Amendment." *Id.* at 328.

In this case, Hutchinson asserts that once he was enrolled in BI, he was ostracized by other inmates, who refused to be friends with him.    Also, he asserts that some inmates threatened him by saying that they would beat him.    He does not, however, set forth the number of inmates that threatened him or the circumstances surrounding the threats.    Thus, it is questionable whether Hutchinson's evidence that he was ostracized and threatened is sufficient to show that that being labeled as a batterer in prison is highly stigmatizing.    Moreover, Hutchinson has not fleshed out the nature of the BI.    For example, although he asserts that instructors ask personal and sexual questions, he does not set forth how long the BI program lasts,[3] or the number of sessions in a given time frame.    Thus, it is questionable whether he has established that BI required the type of intensive and intrusive therapy as did the sex offender therapy at issue in *Renchenski.*    But even assuming that Hutchinson had a liberty interest protected by the Due Process Clause in not being labeled a

_____

[3] There is some evidence in the record that the BI lasts three months. *See Doc. 73* at ¶50 (referring to the BI as a three-month program).    There is also, however, some evidence in the record that the BI lasts six months. *See Doc. 81* (Cook Dep. at 60) at 64.    In either event, the BI is much shorter than the two-year program at issue in *Renchenski.*

batterer and assigned to BI, his claim for monetary damages[4] is barred by qualified immunity.[5]

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). "If the law was clearly established, the

---

4 Again, since Hutchinson has completed the BI and has been paroled, any claim for injunctive or declaratory relief is moot. Thus, only a claim for monetary damages remains.

5 Although defendants Weidel and Cook have not separately argued qualified immunity in their motion for summary judgment, they raised the defense in their answer to Hutchinson's amended complaint, and the Court is entitled to address this defense *sua sponte,* when appropriate. *See Doe v. Delie,* 257 F.3d 309, 312 & 322 n.13 (3d Cir. 2001)(affirming district court's *sua sponte* dismissal under 28 U.S.C. § 1915(e)(2)(B)(ii) on the basis of qualified immunity).

immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The court is permitted to exercise its discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson,* 555 U.S. at 236. So it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.*

The defendants are entitled to qualified immunity because they did not violate rights that were clearly established at the time they acted. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. "This is an objective inquiry, to be decided by the court as a matter of law." *Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004). Because this inquiry focuses on the official's actual situation, the analysis

"must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Saucier,* 533 U.S. at 201). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson,* 555 U.S. at 244 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)). "'If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.'" *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009)(quoting *Saucier,* 533 U.S. at 202). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012)(quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011)).

Here, it was not clearly established at the time of the events in this case that that labeling a prisoner a batterer and assigning him to BI without notice and a hearing violated due process. The parties have cited no cases so holding, and the Court has found none. Moreover, the events at issue in this case concerning defendants Cook and Weidel occurred on or before October 1, 2010, which was before the Third Circuit issued its decision in *Renschenski.* And it was not clearly established before *Renchenski* that due process applied to the labeling of a prisoner

as a sex offender. *Renchenski v. Williams*, 3:06-CV-278, 2012 WL 3560864 (M.D. Pa. Aug. 16, 2012)(granting summary judgment to the defendants on the basis of qualified immunity); s*ee also Warner v. McVey,* 429 F.App'x 176, 178 (3d Cir. 2011)(affirming summary judgment to defendants on the basis of qualified immunity on due process claim based on labeling probationer a sex offender where the events at issue occurred before the opinion in *Renchenski*).   It necessarily follows that an extension of *Renchenski* to a prisoner labeled a batterer and assigned to BI was not clearly established prior to *Renchenski*.   Thus, the defendants are entitled to qualified immunity on the due process claim.


### D.   The Defendants Are Entitled to Summary Judgment on the Retaliation Claims.

Hutchinson claims that defendants Cook, Weidel, and Clapper retaliated against him for asserting that he was going to file another grievance against Cook. He alleges that these defendants conspired to have him confined in the Restricted Housing Unit to prevent him from filing the grievance against Cook.

Retaliation claims are judged against exacting legal standards.   A prisoner claiming that a defendant retaliated against him for exercising his constitutional rights must prove that: (1) his conduct was constitutionally protected; (2) he suffered

"adverse action" at the hands of the defendant; and (3) his constitutionally protected

conduct was a substantial or motivating factor in the decision of the defendant.

*Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir. 2002). "Once a prisoner has made

his *prima facie* case, the burden shifts to the defendant to prove by a preponderance

of the evidence that [he or she] 'would have made the same decision absent the

protected conduct for reasons reasonably related to penological interest.'" *Id.*

(quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3rd Cir. 2001)).

A claim that a prison misconduct was issued in retaliation for constitutionally

protected activity fails when there is "some evidence" to support the disciplinary

finding. *Nifas v. Beard,* 374 F.App'x 241, 244 (3d Cir. 2010)("Nifas's retaliatory

discipline claim fails because there is 'some evidence' supporting the guilty findings

for the three disciplinary charges brought against Nifas after he filed his grievance in

October 2006."); *see also Henderson v. Baird,* 29 F.3d 464, 469 (8th Cir.

1994)(holding that a finding based on "some evidence" that the prisoner committed

the misconduct charged essentially "checkmates" a prisoner's retaliation claim).

Here, Hutchinson claims that the defendants retaliated against him by issuing

him a misconduct. But because Hutchinson admits that the he used abusive

language and it is undisputed that Hutchinson initially refused Cook's direction to

return to Weidel's office, there was some evidence for the misconduct charge.

Thus, the defendants are entitled to summary judgment on the retaliation claim based on the issuance of the misconduct.

Apparently realizing that his retaliation claim fails because there was some evidence for the misconduct charge, in his brief, Hutchinson seeks to change the basis for his retaliation claim. He argues in his brief that the retaliation did not begin with the misconduct charge. Rather, he asserts, the retaliation began in September of 2010, when Cook accused him of being a rapist and an abuser of women, and it purportedly continued during the parole staffing, in October of 2010, when Weidel and Cook again accused him of being a rapist and an abuser and Weidel told him that he looked old. He also asserts that the retaliation continued in the review process for BI and his placement in a group that resulted in his fellow inmates ostracizing him. Hutchinson suggests that the "[d]efendants proceeded on a retaliatory course of action that instigated and incited the misconduct." *Doc. 78* at 16.

The defendants only moved for summary judgment on the retaliation claim that the misconduct, which led to Hutchinson's placement in the Restricted Housing Unit, was issued in retaliation. And with good reason: that is the only retaliation

claim pleaded in the amended complaint. Count 4 (titled Retaliation) of the

amended complaint provides in full:

> 28. Defendants Cook, Wiedel, Clapper and Johnson,
> retaliated against Plaintiff for asserting that he was going to file
> another grievance against Cook. Wiedel, Cook, Clapper and
> Johnson conspired to have Plaintiff confined in the RHU to
> prevent Plaintiff from filing a grievance against Cook.
> Plaintiffs asserts these actions were racially motivated, because
> Plaintiff is a person of another color and the Defendants object to
> Plaintiff filing a grievance against a follow [sic] co-worker.
> 29. Plaintiff has no plain, adequate or complete remedy
> at law to redress the wrongs described herein. Plaintiff has been
> and will continue to be irreparably injured by the conduct of the
> Defendants unless the court grants the declaratory and injunctive
> relief which Plaintiff seek[s].

*Doc. 21* at ¶¶28-29. The amended complaint ties the retaliation to Hutchinson's

placement in the Restricted Housing Unit, which was the result of the misconduct.

It does not plead retaliation claims based on other events, and, therefore, we

conclude that Hutchinson's attempt to add to and broadened his retaliation claim in

his brief is inappropriate.

### D. The Defendants Are Entitled to Summary Judgment on the Equal Protection Claim.

Hutchinson claims that defendants Weidel, Cook, and Clapper conspired to

have him confined in the RHU to prevent him from filing a grievance against Cook

and that this was racially motivated. Hutchinson has not presented evidence, however, to support an equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory. The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See, e.g., id.; McLaughlin v. Florida,* 379 U.S. 184, 192 (1964). To assert a protected-class claim, the plaintiff must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir. 2005) (observing that a prima facie case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals"). Under this theory a plaintiff "must prove the existence of purposeful discrimination" by the defendants. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992). Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants

engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). This theory allows a plaintiff to assert an equal protection claim regardless of protected class when the government irrationally treats the plaintiff differently than similarly situated individuals. *Id.* at 564; *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006). To prevail on a class-of-one claim, the plaintiff must demonstrate that: (1) the defendants treated him differently from others similarly situated; (2) the defendants did so intentionally; and, (3) there was no rational basis for the difference in treatment. *Hill,* 455 F.3d at 239.

Hutchinson suggests that the defendants are racist, and he asserts that "[t]he racism is subtle and therefore there is no objective evidence on the record." *Doc. 78* at 18. To survive summary judgment, a plaintiff must present evidence to support his claims. Because Hutchinson has not presented evidence from which a reasonable trier of fact could conclude that he was treated differently from other similarly situated prisoners or that the defendants purposefully discriminated against him, the defendants are entitled to summary judgment on the equal protection claim.

### E. The Defendants Are Entitled to Summary Judgment on the Conspiracy Claim.

Hutchinson claims that defendants Weidel, Cook, and Clapper conspired to have him confined in the RHU to prevent him from filing a grievance against Cook. "The essence of a conspiracy is an agreement." *United States v. Kelly,* 892 F.2d 255, 258 (3d Cir. 1989). "To demonstrate the existence of a conspiracy under § 1983, 'a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law.'" *LeBlanc v. Stedman*, 483 F. App'x 666, 670 (3d Cir. 2012)(quoting *Parkway Garage, Inc. v. City of Phila.,* 5 F.3d 685, 700 (3d Cir.1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (3d Cir. 2003)). "It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Perez v. Gamez*, 1:13-CV-1552, 2013 WL 6073877 at *9 (M.D. Pa. Nov. 18, 2013). Rather, the plaintiff must present evidence that the defendants acted in concert with the specific intent to violate the plaintiff's rights. *Davis v. Fox*, 3:12-CV-1660, 2013 WL 5656125 at * 5 (M.D. Pa. Oct. 15, 2013). Further, a "conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden,* 423 F. App'x 234, 239 (3d Cir. 2011).

Hutchinson does not cite any evidence to support his conspiracy claim. Rather, he merely cites to allegations in his amended complaint. But at the summary judgment stage, the plaintiff may not merely rely on the allegations of the complaint. Rather, he must present evidence from which a reasonable trier of fact could find in his favor. Because Hutchinson has not presented evidence supporting his conspiracy claim, the defendants are entitled to summary judgment on that claim.

## IV.   Conclusion.

Accordingly, for the foregoing reasons, we will grant the defendants' motion (doc. 70) for summary judgment.


*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge